IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LOTTIE K. TAGUPA, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>     vs.<br><br>VIPDESK, INC.; JOHN DOES 1-10, DOE ENTITIES 1-10,<br><br>          Defendants. | ) CIV. NO. 13-00428 JMS-KSC<br>)<br>) ORDER GRANTING IN PART AND<br>) DENYING IN PART DEFENDANT<br>) VIPDESK, INC.'S MOTION FOR<br>) SUMMARY JUDGMENT<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT VIPDESK, INC.'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Defendant VIPdesk, Inc. ("Defendant" or "VIPdesk") moves for summary judgment in this action brought by its former employee, Plaintiff Lottie K. Tagupa ("Plaintiff" or "Tagupa"), for alleged violations of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"), and the Hawaii Whistleblower Protection Act, Hawaii Revised Statutes ("HRS") § 378-62 ("HWPA").

Based on the following, the Motion is GRANTED as to Count Two (HWPA), and GRANTED in part and DENIED in part as to Count One (FLSA). Genuine issues of material fact remain as to certain aspects of Count One.

## II.  BACKGROUND

A.    **Factual Background**

For purposes of this summary judgment motion, the court views the evidence in the light most favorable to Plaintiff.  *See, e.g.*, *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1270 (9th Cir. 2011).  Applying that standard, the dispute arises from the following circumstances:

1.    ***Tagupa's Employment with VIPdesk and VIPdesk's "Concierge Blog"***

Tagupa began working for VIPdesk on January 17, 2005 as a part-time "remote concierge."  Doc. No. 71-22, Lottie Tagupa Decl. ¶¶ 3, 4.  ("From 1996 to 2010 [she] performed work for America Online ('AOL') as a [freelance] writer, and was paid for articles [she] wrote."  Doc. No. 1, Verified Compl. ¶ 9.) She was terminated on September 8, 2011.  Doc. No. 64-43, Def.'s Ex. I-29.

VIPdesk "employs home-based customer service representatives using Web-enabled and call center technicians to act as concierge and customer care representatives for national brand leaders in the travel, auto, financial services, and retail industries."  Doc. No. 1, Verified Compl. ¶ 12; Doc. No. 11, Answer ¶ 12.  Tagupa's duties as a remote concierge "included, but were not limited to: answering customer calls; making reservations for customers for

airline, travel, rental/personal car, train, hotel, restaurant, theater, medical, florists;

sending customers voucher, itineraries, brochures, receipts, driving directions,

tickets, retail order confirmations/refunds; and many others." Doc. No. 1, Verified

Compl. ¶ 13; Doc. No. 11, Answer ¶ 13.

On March 31, 2005, Tagupa's employment status changed from part-

to full-time. "[F]or purposes of Federal wage-hour law[,] this position is

considered non-exempt." Doc. No. 1, Verified Compl. ¶ 14. By October 24,

2005, "her compensation [was] $9.00 per hour, plus $3.00 per completed request."

*Id.* ¶ 15. And by the end of her employment on September 8, 2011, she "was paid

$9.89 per hour, plus $3.00 per completed request, after submitting her timesheets

electronically to Defendant's payroll department." *Id.* ¶ 16.

On June 14, 2010, a VIPdesk executive sent its employees an email

announcing a "weekly blog" to "enhance" its clients' websites. Doc. No. 71-4,

Pl.'s Ex. D. The email explained:

> The blog should (obviously) be something of interest to
> the customer visiting the website. It could be about a
> great experience you had in a particular hotel or
> restaurant, or it could be about an amazing trip you
> recently took. The possibilities are endless!
>
> So, I am looking for volunteers to help write the blogs. I
> am only looking for one blog from each volunteer
> (although if you would like to submit more you are

certainly welcome!).  Once I get a list of volunteers I will
send out a set of guidelines and deadlines.

If you are interested, please send me an email along with
a topic (or topics) you think you might like to write
about, no later than this Friday, June 18th.

*Id.*  A follow-up email was sent on June 18, 2010, stating "FYI [we] have 13
volunteers so far!  If you are interested, please let me know today!"  Doc. No. 71-
5, Pl.'s Ex. E.

Although the exact timing is unclear, Tagupa alleges that "[i]n order
to assist Defendant in every way possible, I immediately submitted fifteen (15)
blogs with photos which were accepted, approved and posted by Defendant on its
website."  Doc. No. 71-22, Tagupa Decl. ¶ 10.  Tagupa admits, however, that some
of the blog entries that she submitted to VIPdesk "had previously been posted to
[her] own personal travel blog."  Doc. No. 64, Def.'s Concise Statement of Facts
("CSF") ¶ 11.[1]  She also admitted that the fifteen blog entries that were submitted
to VIPdesk for publication "were prepared before VIPdesk even asked employees
to prepare or submit blogs."  *Id.* ¶ 12.[2]

---

[1]  Where a fact asserted in a CSF is admitted, the court cites directly to the CSF.

[2]  At the August 24, 2015 hearing, Tagupa's counsel clarified that she is not seeking
overtime for work done on these entries.  (VIPdesk claims it has only identified fourteen entries
that Tagupa submitted, but accepts for purposes of summary judgment that she submitted fifteen.
*See* Doc. No. 64, Def.'s CSF at 2 n.1.)

4

Nevertheless, Tagupa also attests that she "prepared another fifty-two (52) blogs with photos to be submitted to Defendant," Doc. No. 71-22, Tagupa Decl. ¶ 10, although she never submitted them to VIPdesk for publication. Doc. No. 64, Def.'s CSF ¶ 3. She claims that "Defendant encouraged nationwide employees to work on, prepare and submit blogs for Defendant's for-profit purposes in order to be considered a team player and assist Defendant in maximizing its bottom line." *Id.*

For example, she points to a January 18, 2011 email from VIPdesk encouraging blogs, which stated, in part:

> Subject:  Bloggers!! :) - Please read
>
> We are very excited as our updated website is in the final stages of launching and rolling out to our clients.  We will be looking for new blogs to add so please let me know if you have any new submissions that we can get in-line to post.

Doc. No. 71-9, Pl.'s Ex. I.  Similarly, she cites a February 22, 2011 email from VIPdesk addressed to her and others, stating in part:

> You were picked to attend this call because you expressed an interest in blogging for the VIPdesk Concierge blog and now we need your help!  Some of you have already submitted blogs and others have not; either way, plan on learning what's next in this call.
>
> . . . Our clients are very excited about this blog and can't

wait to see what you guys have to say.

We are ready to hit the ground running . . . We will need all the blogs you can write in order to make this a success!  If you have already submitted a blog, be thinking of what your next topic will be, and if you said you could submit one but haven't yet, get ready to polish it up -- we need it!

Doc. No. 71-8, Pl.'s Ex. H.  *See also* Doc. No. 71-10, Pl.'s Ex. J (Mar. 3, 2011 email reminding the "Blogger Team" to "please submit your first blog, commitment, bio and headshot by tomorrow. . . .  We need all the help we can get to make this blog a success and you [are] all awesome for volunteering!"); Doc. No. 71-18, Pl.'s Ex. R (Aug. 30, 2010 email from VIPdesk stating "[a]s you may already know, we . . . are looking for volunteers to contribute to the blog.  If you are interested in volunteering, please let me know so as soon as possible, as we would like to have a dedicated list of volunteers.").

On March 1, 2011, a VIPdesk email to its "bloggers" emphasized that "[w]e understand this is voluntary so please be realistic and let us know what you think you can contribute[.]"  Doc. No. 71-12, Pl.'s Ex. L.  Tagupa claims that an attachment to that email explained that "[a]t this time, the Concierge Blog is a purely volunteer project to be done in your own free time."  Doc. No. 71-22, Tagupa Decl. ¶ 16; *see* Doc. No. 64-7, Def.'s Ex. E at 31.  Tagupa contends that

she was "shocked" that bloggers would not be paid because she was a member of a class action (*Hallissey v. America Online, Inc.*) against AOL, and alleges that "Defendant was affiliated with AOL [which] had just settled its lawsuit for not paying employee 'volunteers' for fifteen million dollars[.]" *Id.*

Much of the suit concerns time that Tagupa claims she spent outside of her normal working hours working on blogs (including researching and visiting locations, and writing entries). She claims that "[i]n order to stay in Defendant's good graces and be eligible to receive raises or a promotion in the future, I worked very hard to prepare and submit as many blogs as possible which Defendant greatly appreciated." Doc No. 71-22, Tagupa Decl. ¶ 15. "Defendant derived direct and substantial benefits from its 'volunteers' [sic] work without having to pay for it, and as the above emails indicate, Defendant asserted pressure on employees to submit blogs." *Id.*

Ultimately, Tagupa claims she "ha[s] not been paid for 2,084 hours of time spent on the blogs at time and a half pay [amounting to] $30,926.56." *Id.* ¶ 25.[3] In this regard, the record contains pages of daily time sheets (along with

---

[3] She also claims she was not paid for other overtime that apparently is not related to her blogging. *See* Doc. No. 71-22, Tagupa Decl. ¶ 26 ("I have not been paid for 80 hours of time spent traveling to and from the Post Office on Defendant's business mailing tickets, itineraries, brochures, email confirmations, receipts, and others to clients."). Although most of the Complaint concerns failure to pay "volunteers" for blogging, this same allegation regarding

(continued...)

what appears to be proposed blogs on travel-related topics), beginning on June 14,

2010, and continuing through September 4, 2011.  *See* Doc. No. 64-9, Def.'s Ex.

G-1 at 99 to 284; Doc. No. 64-10, Def.'s Ex. G-2 at 2 to 286; Doc. No. 64-11,

Def.'s Ex. G-3 at 2 to 144.

### 2.      *Tagupa's "Protected Activity"*

In March, August, and September of 2011, Tagupa complained to her

supervisors at VIPdesk, to the U.S. Department of Labor, and to the Hawaii

Department of Labor and Industrial Relations ("DLIR") about (among other

matters) VIPdesk's failure to pay "volunteers" for blogging.  She claims that

> On March 2, 2011, I engaged in protected activity when I
> informed my immediate supervisor Manager Eleu
> Ornellas and Supervisor Manager Rob Alexander that it
> was "illegal" for Defendant not to pay employees for the
> work performed researching, writing, and obtaining
> photographs for the blogs because they were non-exempt
> hourly employees working for a "for-profit" company.
> Both informed me that I was a "volunteer" and nothing
> was done about my reports of illegal non-payment to
> employee bloggers including myself.

Doc. No. 71-22, Tagupa Decl. ¶ 17.  She says she "engaged in protected activity

when [she] reported via written report on-line to the United States Department of

Labor" that "Defendant was not paying employees . . . for the blog posts," as well

---

[3](...continued)
"other hours" is also made in the Complaint.  *See* Doc. No. 1, Verified Compl. ¶ 34.

8

as "not compensating Plaintiff for travel to and from the U.S. Post Office for

mailing documents to customers," and for time related to computer problems.  *Id.*

¶ 18.  The U.S. Department of Labor opened an investigation into Tagupa's report.

*See, e.g.*, Doc. Nos. 71-13, Pl.'s Ex. M.

Tagupa also points to an August 5, 2011 email to a VIPdesk human

resource manager that Tagupa says she sent "after repeatedly informing Defendant

that it could not escape payment to employees for work performed on the blogs by

calling employees 'volunteers.'"  Doc. No. 71-22, Tagupa Decl. ¶ 20.  The email

states in part:

> Here is the e-mail that started it all.
>
> It states volunteer, but since state and federal labor law is
> so clear about asking non-exept [sic] worker to work
> unpaid for company gain, I NEVER thought VIPdesk
> would ask non-exempt employees to work for UNPAID
> for company profit.
>
> I was under the impression that the call was put out for
> those who wanted to volunteer for the project, not
> volunteer for the project AND contribute
> uncompensated.

Doc. No. 71-14, Pl.'s Ex. N.  She claims that, on August 5, 2011, she

> also informed them that it was "illegal" for Defendant
> not to pay me for work I performed and I had confirmed
> this with the United States Department of Labor, and the
> State of Hawaii [DLIR].  Defendant's Human Resource

9

> Administrator Karyn Schneider informed me that an
> investigation would be conducted as to my report of not
> being paid for work I performed.

Doc. No. 71-22, Tagupa Decl. ¶ 21.  She wrote to VIPdesk:

> I want to have addressed the issue of not paying me for
> my blog submissions.  I have mentioned this more than
> once to managers and have been ignored, the issue stems
> from not paying non-exempt hourly employees for work
> done to benefit the company financially.  As I understand
> it, this is illegal on the Fed and State level and I want to
> be compensated for the work I have done and has been
> used for the benefit of VIPdesk and their clients since
> mid-2010.

*Id.*

Tagupa apparently aired some of her views to other employees in a

"group chat" on August 4, 2011, saying she was "not an indentured slave" and

"didn't appreciate a company that skirts laws and makes employees pay for it,"

and was subsequently "admonished" with an August 11, 2011 email from VIPdesk

management asking her (among other things) to "use the chat for productive talk,

and not . . . to air malicious gossip."  Doc. No. Doc. No. 71-15, Pl.'s Ex. O.

She also attests that

> [o]n or about September 7, 2011, I again engaged in
> protected activity when I reported to the State of Hawaii
> [DLIR] Specialist Lori Hamada that:
>     (a) Defendant was making unauthorized
> deductions from my paycheck without my permission to

do so; and

> (b)  Defendant was not paying me for the work I performed researching, writing, and obtaining photographs for the blogs.

Doc. No. 71-22, Tagupa Decl. ¶ 24.

### 3.    *Tagupa's Termination of Employment*

Tagupa was terminated by a written "Request to Terminate" dated September 8, 2011.  Doc. No. 64-63, Def.'s Ex. I-29.  This document gives the reason for termination as "[b]ased on the instances of non-compliance with VIPdesk policies and Lottie's overall performance in the Concierge position, VIPdesk has decided to terminate Lottie's employment effective immediately."  *Id.*  It explains:

> VIPdesk randomly listened to calls from Lottie and discovered a call on 8/24/11 that did not meet VIPdesk's customer service and call handling expectations.  The customer wanted to add additional information to an existing travel case that was being handled by another Concierge.  Lottie told the customer that she had to email the information and also told the customer that we do not take credit cards over the phone, which is not the correct policy.  Lottie did not notate the case that the customer called in to update her information.  This call is considered a refusal to provide service as Lottie did not follow policies and did not provide service to the customer, which is a form of call avoidance.

*Id.*  It recounts prior warnings that VIPdesk had given to Tagupa:

11

> Lottie has received two recent warnings related to her
> conduct and following policies.
>
> On 8/4/11, Lottie received a Final Written Warning for
> quality and Misconduct.  Lottie did not follow policy and
> procedure regarding VIPdesk's Multiple Request policy
> and was warned that any future occurrences violating our
> policies would result in immediate termination.
>
> On 3/2/11, Lottie received a Final Written Warning for
> Quality and Misconduct.  Lottie was warned about her
> conduct when speaking with her manager and the
> Director, Service Delivery after a call in which Lottie
> spoke inappropriately to the management team members.
> Lottie has received prior warnings regarding her quality,
> mishandling of cases, and attendance.  Lottie was
> reminded of VIPdesk's policies when she received these
> warnings.  In addition, Lottie has been sent the VIPdesk
> Team Member Handbook and the Concierge Operations
> Policies Manual and has access to VIPdesk's policies
> and expectations.

*Id.*  The "Request to Terminate" thus reveals the context in which to view

Tagupa's blogging activities, and her protected activity described above.

The record reflects that from October 2008 to September 2011,

Tagupa had received twenty-nine written disciplinary actions against her in the

form of "emails, written performance evaluations, coaching records, final written

warnings, or requests to terminate."  Doc. No. 64, Def.'s CSF ¶ 29; Doc. Nos. 64-

15 to 64-43, Def.'s Exs. I-1 to I-29.  Of these twenty-nine incidents, twenty of

them occurred before March 2, 2011 (the first documented incident of Tagupa's

12

"protected activity").  For example, Tagupa had received a "final written warning"
on December 29, 2008 for poor work (sub-par "quality performance scores" for
every month from July to December 2008).  Doc. No. 64-17, Def.'s Ex. I-3.  This
warning included a notice that Tagupa could "be subject to further disciplinary
action up to and including termination."  *Id.* at 3.

VIPdesk records also detail a February 24, 2011 telephone conference
between Tagupa, her supervisor (Eleu Ornellas), and the VIPdesk Director of
Service Delivery (Robert Alexander).  *See* Doc. No. 64-34, Def.'s Ex. I-20.  A
February 26, 2011 email from Eleu Ornellas to VIPdesk personnel provides in
part:

> The intention of the call on [February 24, 2011] was to
> inform Lottie that her performance did not meet our
> Quality standards and provide her with written
> documentation and her probationary action plan.  The
> call quickly shifted focus from substandard quality
> performance to Lottie's financial problems due to what
> she claimed was a 25% decrease in her income due to
> changes made by VIPDesk to the commission structure.
> No matter how many times Rob and I tried to steer the
> conversation back to the topic of quality Lottie kept
> coming back to her pay, interrupting us and often
> shouting. . . .
>
> The call lasted for about 40 minutes most of which was
> not spent discussing quality. . . .  I reviewed with her
> what we were going to do which was pull her off the
> phones for 5 days so that she could focus on emails.  I

> also told her that I would meet with her on Sunday to
> review call recordings together.  Finally I told her that I
> would be sending her an email immediately following
> the call which would give her a break down of her emails
> for the last 6 months and the categories in which she
> needs to focus.
>
> I will meet with Rob on Monday and discuss the [Final
> Written Warning].

*Id.* at 2.  For his part, in a February 25, 2011 email, Robert Alexander documents

the conversation, in part, as follows:

> After Lottie's action on yesterday's call with her we are
> going to proceed with a [Final Written Warning],
> including subordination with her Quality issues. . . .
> Here is my recap of the call:
>
> Lottie was extremely agitated with both Eleu and I from
> the start of the call.  At the beginning, I told her she was
> not meeting quality standards of 85 points a month, that
> she had not scored that high for most of the past year.
> She needed to work on her scores.  She then said that her
> customers love her.  We let her know that our contract
> with BCD requires her to maintain a level of quality.  It
> was then that Lottie began yelling and screaming at me,
> telling me that I was responsible for her possible going
> into foreclosure.
> . . . .
> She then really blew up.  Crying, yelling and basically
> telling us that VIPdesk is horrific and that she is
> constantly fighting off creditors and [it's] all my fault.
> She would not listen to anything about quality.  She said
> that it makes no difference.  She insisted that we are
> leaving her in a state of limbo, not knowing when we are
> going to change the rules and her pay again.  She then

14

> yelled WHAT ARE THE NEXT CHANGES[?]  WHAT
> IS NEXT[?]  HOW CAN I HAVE PEACE WHEN YOU
> ARE CHANGING THE RULES ALL THE TIME[?]
>
> After I told her that she needed to relax, Eleu jumped in
> and led with the game plan going forward.  I hung up the
> call furious and insulted.

*Id.* at 3.

This February 24, 2011 conversation, and Tagupa's subpar quality

performance scores for the prior six months, were reflected in the March 2, 2011

"Final Written Warning" (referred to in the September 8, 2011 Request to

Terminate) issued to Tagupa.  After listing six consecutive months of quality

performance scores that were below VIPdesk's required scores, the March 2, 2011

Final Written Warning documents the February 24, 2011 conversation:

> On 2/24/11, Robert Alexander, Director, Service
> Delivery and Eleu Ornellas, Concierge Manager, called
> [Tagupa] to discuss her quality scores and provide
> feedback and an outline of a performance improvement
> plan.  Lottie raised her voice and used a tone that was
> perceived as inappropriate and disrespectful.
> Throughout the call, Lottie would not discuss her quality
> scores and continued to raise her voice to the
> management team regarding topics such as pay.
> These actions are a violation of VIPdesk's Team
> Member Conduct policy, outlined in VIPdesk's Team
> Member Handbook.
> . . . .
> As outlined on this document, Lottie's quality
> performance and Team Member conduct is below

> VIPdesk's expectations.  Lottie has received training on
> quality expectations and has received prior warnings
> outlining her performance and improvements needed.
> While VIPdesk is fully confident of Lottie's ability to
> succeed in her job it is important that she improve her
> performance immediately and sustain her performance to
> meet VIPdesk's expectations consistently going forward.
>
> In addition, VIPdesk's culture is one that embraces
> respect, working as a team, and being helpful to fellow
> team members.  VIPdesk expects that Lottie will uphold
> these beliefs starting immediately and adhere to VIPdesk
> standards of conduct and communications etiquette.

Doc. No. 64-35, Def.'s Ex. I-21 at 3.  It outlined a "performance improvement

plan," and warned:

> While VIPdesk is fully confident in Lottie's ability to
> succeed and improve, it is important to know that further
> inability to consistently follow Company policies and/or
> meet Company's expectations will be grounds for
> disciplinary action up to and including termination of
> employment.

*Id*. at 4.

Finally, the September 8, 2011 Request to Terminate refers to another

Final Written Warning (of August 4, 2011) which documents four additional

consecutive months (from March to June of 2011) of sub-par quality performance

scores.  Doc. No. 64-40, Def.'s Ex. I-26.  It also documents a customer request on

July 8, 2011 that was not serviced in a timely fashion, and an associated violation

16

of VIPdesk policy.  Specifically, it provides that "Eleven (11) additional requests

were added to the case after the customer declined further assistance from Lottie.

The requests were not approved by the customer and should not have been added

to the case, violating VIPDesk's Multiple Request policy."  *Id.* at 3.  It explains

that

> Logging requests that were not initiated by the customer
> is a serious infraction and violates VIPdesk's Team
> Member Conduct Policy in addition to the Operations
> policy. Lottie was paid for requests that were not
> authorized and she did not earn.

*Id.*  And it warns:

> Lottie is to immediately improve her quality scores to
> meet VIPdesk's expectations.  Lottie has received
> numerous warnings and coachings from her manager and
> Lottie is aware of the Quality Program expectations.
> Lottie's August quality score must meet VIPdesk's
> Quality Score guidelines.
>
> In addition, Lottie will follow all VIP desk Operations
> policies immediately and going forward.  Lottie's pay
> will be deducted by $10 on the 8/15/11 pay period to
> recover the amount she was overpaid for false requests
> that were in violation of our policies.
>
> Further inability to follow policies will result in
> immediate termination.

*Id.* at 3.

For her part, Tagupa responded on August 5, 2011 (including the

17

"protected activity" described above) stating that:

> 1)  the request in question were [sic] not intentional. They were placed on the wrong case while I was working multiple cases with tech problems.
>
> 2)  I checked with the state labor board here in Hawaii and imposing a $10 "fine" is illegal in the state of Hawaii.
>
> 3)  I want to have addressed the issue of not paying me for my blog submissions.  I have mentioned this more than once to managers and have been ignored.   The issue stems from not paying non-exepmt [sic] hourly employees for work done to benefit the company finalncially [sic].  As I understand it, this is illegal on the Fed and State level and I want to be compensated for the work I have done and has been used for the benefit of VIPdesk and their clients since mid-2010.

*Id.* at 4.

These incidents are analyzed more fully below, when discussing whether VIPdesk's termination could have been motivated by Tagupa's protected activity.

**B.     Procedural Background**

Tagupa filed this action on August 27, 2013, asserting claims for violations of the FLSA (Count I), violations of the HWPA (Count II), and

Wrongful Termination in Violation of Public Policy (Count III).[4]  Doc. No. 1.

On June 3, 2015, VIPdesk filed its Motion for Summary Judgment.

Doc. No. 63.  Tagupa filed her Opposition on July 27, 2015, Doc. No. 68, and

VIPdesk filed a Reply on August 3, 2015.  Doc. No. 73.  The Motion was heard on

August 24, 2015.

### III.  **STANDARD OF REVIEW**

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who

fails to make a showing sufficient to establish the existence of an element essential

to the party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of

Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of

---

[4]  Count III was dismissed with prejudice by stipulation.  Doc. No. 49.  Plaintiff brought the FLSA claim both individually and as an "opt in" class action, but she subsequently notified the court that she will not file a motion for class certification.  Doc. No. 16.

Public records indicate that Plaintiff previously filed a *pro se* action against VIPdesk in the District Court of the Third Circuit of the State of Hawaii, but that action was dismissed by Plaintiff without prejudice in lieu of this federal action.  *See Tagupa v. VIPdesk*, ___ P.3d ___, 2015 WL 3946796, at *1 (Haw. June 29, 2015) (affirming award of fees and costs to VIPdesk after Tagupa dismissed the suit without prejudice, "acknowledg[ing] that she filed the case, *pro se*, in the wrong court, and attached a 'draft lawsuit for the correct court,' *i.e.*, the United States District Court for the District of Hawai'i, to her motion to dismiss").

informing the court of the basis for its motion and of identifying those portions of

the pleadings and discovery responses that demonstrate the absence of a genuine

issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's

Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).   "When the moving party has

carried its burden under Rule 56[(a)], its opponent must do more than simply show

that there is some metaphysical doubt as to the material facts [and] come forward

with specific facts showing that there is a *genuine issue for trial*."  *Matsushita

Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and

internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere

allegations or denials of his pleading" in opposing summary judgment).

      "An issue is 'genuine' only if there is a sufficient evidentiary basis on

which a reasonable fact finder could find for the nonmoving party, and a dispute is

'material' only if it could affect the outcome of the suit under the governing law."

*In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at

248).   When considering the evidence on a motion for summary judgment, the

court must draw all reasonable inferences on behalf of the nonmoving party.

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille*

*Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence

of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn

in his favor." (citations omitted)).

## IV.  **DISCUSSION**

**A.      Hawaii Whistleblower Claim -- Standards**

Section 378-62 of the HWPA provides in relevant part:

An employer shall not discharge, threaten, or otherwise
discriminate against an employee regarding the
employee's compensation, terms, conditions, location, or
privileges of employment because:

(1) The employee, or a person acting on behalf of the
employee, reports or is about to report to the employer,
or reports or is about to report to a public body, verbally
or in writing, a violation or a suspected violation of:

(A) A law, rule, ordinance, or regulation, adopted
pursuant to law of this State, a political
subdivision of this State, or the United States[.]

An HWPA claim under § 378-62 has three requirements.  First, an

employee must have "engaged in protected conduct" as defined by HRS § 378-

62(1).  *Griffin v. JTSI, Inc.*, 654 F. Supp. 2d 1122, 1131 (D. Haw. 2008) (citing

*Crosby v. State Dept. of Budget & Fin.*, 76 Haw. 332, 342, 876 P.2d 1300, 1310

(1994)).  Second, the employer must take some "adverse action" against the

employee.  *Id.*  And third, there must be "a causal connection between the alleged

retaliation and the 'whistleblowing.'" *Id.*  To meet the causal connection

requirement, an "employer's challenged action must have been taken 'because' the

employee engaged in protected conduct." *Id.*

To analyze the causal connection requirement, the HWPA follows

"traditional labor management relations discharge cases," *Crosby*, 76 Haw. at 342,

876 P.2d at 1310, where "the employer bears the burden of negating causation

once the employee makes an initial showing of a causal connection." *Griffin*, 654

F. Supp. 2d at 1131 (internal quotation marks and citations omitted).  Thus, the

causal connection requirement has two stages.  "First, the employee must make a

prima facie showing 'that his or her protected conduct was a "substantial or

motivating factor" in the decision to terminate the employee.'" *Id.* at 1131

(quoting *Crosby*, 76 Haw. at 342, 876 P.2d at 1310).  "Second, once the employee

makes its prima facie showing, the employer must then 'defend affirmatively by

showing that the termination would have occurred regardless of the protected

activity.'" *Id.* at 1132 (quoting *Crosby*, 76 Haw. at 342, 876 P.2d at 1310 (internal

quotation marks and citation omitted)).

### 1.   *Causal Connection -- Prima Facie Showing*

In addressing whether an employee's protected activity was a

"substantial or motivating factor" for an adverse action, *Crosby* describes the test

22

as whether the activity "played a role in the employer's action."  *Crosby*, 76 Haw. at 342, 876 P.2d at 1310; *see also Griffin*, 654 F. Supp. 2d at 1131 n.20 ("The Hawaii Supreme Court seems to agree that there is no required level of substantiality, requiring only that the employee's protected conduct 'played a role in the employer's action.'") (citing *Crosby*).  And "a plaintiff can introduce evidence regarding the 'proximity in time between the protected action and the allegedly retaliatory employment decision,' from which a 'jury logically could infer' [the connection]."  *Griffin*, 654 F. Supp. 2d at 1132 (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003)).  That is, "[although] an employee may always present direct evidence of motive, proximity in time is one type of circumstantial evidence that is sufficient on its own to meet the plaintiff's burden."  *Id.* (citation omitted).

### 2. *Causal Connection -- Affirmative Defense*

In allowing an employer to demonstrate it would have taken the same action against an employee regardless of the employee's protected activity, *Crosby* articulated the same "mixed motive" analysis used to address whether public employees suffer a constitutional violation by being retaliated against for making protected speech.  *See, e.g.*, *Gilbrook v. City of Westminster*, 177 F.3d 839, 853-54 (9th Cir. 1999).  *Gilbrook* summarized this analysis as follows:

23

> [*Mt. Healthy City School District v. Doyle*, 429 U.S. 274
> (1977)] formulated a two-part burden-shifting inquiry for
> cases involving mixed motives for discharge.  First, the
> plaintiff must show that his or her conduct was
> constitutionally protected and that the conduct was a
> "substantial" or "motivating" factor in the defendant's
> employment decision.  If the plaintiff makes those
> showings, then the burden shifts to the defendant to
> show "by a preponderance of the evidence that it would
> have reached the same decision . . . even in the absence
> of the [plaintiff's] protected conduct."

*Id.* (quoting *Mt. Healthy*, 429 U.S. at 287); *see also, e.g.*, *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911 & n.2 (9th Cir. 1996) (discussing and adopting *Mt. Healthy's* "dual motive" test under the Fair Labor Standards Act's anti-retaliation provision, 29 U.S.C. § 215(a)(3)).

Under this analysis, employers are "entitled to summary judgment if they can demonstrate that they 'would have reached the same adverse employment decision even in the absence of the employee's protected conduct.'"  *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 752 (9th Cir. 2010) (quoting *Eng v. Cooley*, 552 F.3d 1062, 1072 (9th Cir. 2009)).  "In other words, [they] may avoid liability by showing that the employee's protected speech was not a but-for cause of the adverse employment action."  *Id.*[5]

---

[5]  *University of Texas Southwest Medical Center. v. Nassar*, 133 S. Ct. 2517 (2013), held in a Title VII context that "retaliation claims must be proved according to traditional principles of
(continued...)

Furthermore, in analyzing the HWPA, *Griffin* explained that "[a]n employer may negate causation ex post facto by presenting evidence of other reasons for termination outside of the protected conduct, even if the other reasons were unknown to the employer at the time of termination."  654 F. Supp. 2d at 1132 (citing *Nabors Alaska Drilling Inc. v. N.L.R.B.*, 190 F.3d 1008, 1015 (9th Cir. 1999) ("The employer can fulfill its burden by demonstrating that facts discovered after termination gave rise to a legitimate basis for discharge, even if the employee was originally fired for an improper reason.")).

"[A]n aggrieved employee always retains the ultimate burden of proof" under the HWPA.  *Crosby*, 76 Haw. at 342, 876 P.2d at 1310 (citing *Sonicraft, Inc. v. N.L.R.B.*, 905 F.2d 146, 150 (7th Cir. 1990)).  Although "the employer has an affirmative defense (no causation), as to which of course he bears the burden of persuasion, but so far as the main case is concerned the burden of persuasion never shifts." *Id.*

---

[5](...continued)
but-for causation," and explained that this "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id*. at 2533.  "Whether and to what extent *Nassar* . . . may have a bearing on retaliation claims under the FLSA is at this point unclear[.]"  *Avila v. Los Angeles Police Dep't*, 758 F.3d 1096, 1107 n.3 (9th Cir. 2014) (Vinson, D.J., dissenting); *see also id.* at 1101 n.3 (majority declining to address whether *Nassar* affects an FLSA anti-retaliation analysis).  Regardless of how federal law is developing, however, the court analyzes the issues here as discussed in *Crosby*, mindful that it is applying a *state* statute (albeit one that follows "traditional labor management relations discharge cases").  *Crosby*, 76 Haw. at 342, 876 P.2d at 1310.

**B.      Hawaii Whistleblower Claim -- Application of Standards**

The first two elements of an HWPA claim ("protected activity" and "adverse action") are not at issue for purposes of this Motion.  Construing the evidence in favor of Tagupa, she reported violations of wage and overtime laws to the U.S. Department of Labor and the Hawaii DLIR, and complained to supervisors about the same or similar issues.  *See, e.g.*, Doc. No. 71-22, Tagupa Decl. ¶¶ 17-24.  She thus engaged in "protected activity" under HRS § 378-62(1)(A).  Furthermore, Tagupa was terminated on September 8, 2011, after engaging in such activity.  *Id.* ¶ 33; Doc. No. 64-43, Def.'s Ex. I-29.  Discharging an employee constitutes "adverse action" under § 378-62.  Rather, the focus is on the third element (causation) -- VIPDesk argues that Tagupa cannot prove she was terminated "because of" her protected activity and is thus entitled to summary judgment on the HWPA claim.  The court agrees.

Initially, construing all inferences in the evidence in her favor, Tagupa has established a prima facie case under *Crosby*.  Tagupa attests that she complained to a manager and a human resources administrator of VIPdesk in March and August 2011 regarding a failure to pay non-exempt workers for "voluntary" work, telling them she had "confirmed" the illegality of such a practice with the U.S. Department of Labor and the Hawaii DLIR.  Doc. No. 71-

22, Tagupa Decl. ¶¶ 18, 20, 47.  As evidence of retaliation, she cites an August 11,

2011 email from VIPdesk's "Director of Service Delivery, Robert Alexander,"

counseling her for an August 4, 2011 improper use of a "group chat" with

VIPdesk employees in which Tagupa complained that she was "an indentured

slave" and referred to VIPdesk as a "company that skirts laws." *Id.* ¶ 22.

She also attests that "[o]n or about September 7, 2011 [she] reported

to the State of Hawaii, Department of Labor and Industrial Relations . . . that . . .

Defendant was not paying Plaintiff for the work she performed researching,

writing, and obtaining photographs for the blogs." *Id.* ¶ 48.  She was told that an

employer "could not escape payment by labeling [her] a 'volunteer.'"  *Id.*  She was

terminated the next day, although there is no evidence in the record that VIPdesk

was aware of this particular complaint, and -- when pressed at oral argument --

Tagupa's counsel was also unable to point to any evidence that VIPdesk was

aware at that time of a September 7, 2011 complaint to the Hawaii DLIR.

Given a relatively short time, however, between at least some of her

protected activity and her termination (for example, VIPdesk was aware of

protected activity in August 2011), questions of material fact exist as to whether

Tagupa's actions were a "substantial or motivating factor" in her termination.  *See,*

*e.g.*, *Griffin*, 654 F. Supp. 2d at 1132 ("[G]iven the close temporal proximity

27

between Plaintiffs' reporting to outside government officials and their ultimate

removal and termination . . . a reasonable jury could infer that Plaintiffs were

removed and terminated because of their [protected activity.]").

But VIPDesk has met its burden at the final *Crosby* stage, that is, it

has uncontested evidence that it would have terminated Tagupa even in the

absence of her protected activity.  Tagupa has not disputed that she received

multiple poor performance reviews -- VIPDesk gave her twenty nine separate

written negative performance evaluations, reviews, or warnings about her poor

performance before it terminated her.  *See* Doc. No. 64, Defs.' CSF ¶¶ 28-30; Doc.

Nos. 15 to 43, Def.'s Exs. I-1 to I-29.  These include twenty incidents that

occurred *before* March 2, 2011, which is when Tagupa first engaged in "protected

activity," that, at minimum, establish that Tagupa had a poor work history.  The

incidents include:

> (1) a "final written warning" of December 29, 2008 for poor
> work (sub-par "quality performance scores" for every month
> from July to December 2008.  Doc. No. 64-17, Def.'s Ex. I-3.
> This warning included a notice that Tagupa could " be subject
> to further disciplinary action up to and including termination."
> *Id.* at 3;

> (2) Multiple incidents of tardiness and unexcused absences in
> 2009 and 2010.  Doc. Nos. 64-18 to 64-33, Def.'s Exs. I-4 to I-
> 19.  These warnings also stated that "[i]f Lottie Tagupa does
> not limit her absences to the maximum allotted per company

policy, she will be [the] subject of disciplinary action up to an including termination."  Doc. No. 64-33, Def.'s Ex. I-19 at 4.

(3) Counseling for poor performance on February 24, 2011 for not meeting quality standards and to discuss a "probationary action plan."  Doc. No. 64-34, Def.'s Ex. I-20.  Instead of accepting counseling or coaching, a supervisor describes Tagupa's behavior as "yelling and screaming at me, telling me that I was responsible for her possib[ly] going into foreclosure."  *Id.* at 2.  She "blew up" and was "[c]rying, yelling and basically telling us that VIPdesk is horrific and that she is constantly fighting off creditors and [it's] all my fault. She would not listen to anything about quality."  *Id.*

(4) A March 2, 2011 "final written warning" based on six months of quality performance scores that did not meet company standards, and on behavior perceived as insubordinate and in violation of company policy.  Doc. No. 64-35, Def.'s Ex. I-21.[6]

These documented instances of poor performance, which occurred

before any protected activity (and thus could not have been generated as a pretext

for retaliation), provide ample (non-discriminatory) reason for Tagupa's

termination.

Moreover, VIPdesk has proffered a declaration from Tagupa's

supervisor Eleu Ornellas testifying that Tagupa was terminated "[d]ue to her poor

---

[6] Although there may be some question whether Tagupa's March 2, 2011 report to the U.S. Department of Labor occurred before or after this March 2, 2011 warning from VIPdesk, it is undisputed that VIPdesk had counseled Tagupa about her poor performance on February 24, 2011, and had decided in February 2011 to issue this March 2, 2011 written warning.  See Doc. No. 64-34, Def.'s Ex. I-20.

performance [and] the seriousness of her violations of company policy as reflected in company disciplinary records."  Doc. No. 64-1, Ornellas Decl. ¶ 7.  Ornellas attests that "VIPdesk would have terminated Ms. Tagupa whether or not she had engaged in any whistleblowing protected under the Hawaii Whistleblower Protection Act."  *Id.*  And Tagupa has offered no evidence to contradict these statements.[7]

Similarly, VIPdesk's September 8, 2011 termination ("Request to Terminate") explains that Tagupa was terminated "[b]ased on the instances of non-compliance with VIPdesk policies and Lottie's overall performance in the Concierge position[.]"  Doc. No. 64-43, Def.'s Ex. I-29.  It recounts prior "final Written Warnings" of March 2, 2011, and August 4, 2011, and describes a further instance of a violation of company policy on August 24, 2011:

VIPdesk randomly listened to calls from Lottie and

---

[7]  She contends that some negative reviews were not justified because warnings for tardiness or absenteeism were "automatically generated" and some were caused by computer problems.  *See* Doc. No. 71, Pl.'s CSF ¶ 28; Doc. No. 71-22, Tagupa Decl. ¶ 36 ("The 'coaching sessions' were generated automatically by the computer when there were no key strokes.").  She does not dispute, however, that twenty-nine actions were taken against her, and that twenty occurred before she engaged in protected activity.  She claims, however, that "Defendant did not fire employees for 'computer problems' and 'lates' for computer key strokes. . . .  If Defendant did, it would have fired me years ago for other 'final warnings' issued."  Doc. No. 71-22, Tagupa Decl. ¶ 38.  She thus appears to admit that she could have been terminated earlier, but simply was not.  Moreover, as VIPdesk points out, if the negative reviews for tardiness or absenteeism were automatically generated by computer monitoring of an employee's work station, then these reviews could not indicate a subjective intent to discriminate or retaliate against her.

> discovered a call on 8/24/2011 that did not meet
> VIPdesk's customer service and call handling
> expectations.  The customer wanted to add additional
> information to an existing travel case that was being
> handled by another Concierge.  Lottie told the customer
> that she had to email the information and also told the
> customer that we do not take credit cards over the phone,
> which is not the correct policy.  Lottie did not notate the
> case that the customer called in to update her
> information.  This call is considered a refusal to provide
> service as Lottie did not follow policies and did not
> provide service to the customer, which is a form of call
> avoidance.

*Id.* Tagupa attempts to dispute this reason for her termination, explaining that:

> A customer called back complaining about the cost
> quoted by another CSR.  I discovered that the previous
> CSR did not apply the customer's 'kamaaina rate'
> quoting him twice what he had to pay. . . .  I received the
> standard $3[] fee for each call I assist.  I did not 'falsify'
> any records to obtain the $3[] fee.  Defendant routed the
> caller to me, I did my job by assisting the caller.

Doc. No. 71-22, Tagupa Decl. ¶ 37.[8]  Tagupa's explanation, however, does not

dispute that she failed to follow company policies (regarding credit cards or to

"notate the case").  And her response does not create a triable issue of fact that the

circumstances were untrue or pretextual, much less dispute that VIPdesk had

---

[8] It is not clear whether Tagupa is disputing the circumstances of the August 24, 2011 customer phone call, or is referring to the July 8, 2011 service requests that were not approved by a customer that apparently violated VIPdesk's "multiple request policy."  Either way, her response does not create a dispute of fact that she would have been terminated regardless of her protected activity.

warned her on August 4, 2011 that "[f]urther inability to follow policies will result in immediate termination."  Doc. No. 64-40, Def.'s Ex. I-26.

In sum, even construing material disputes of fact in Tagupa's favor, VIPdesk has met its burden to show that "the termination would have occurred regardless of the protected activity." *Crosby*, 76 Haw. at 342, 876 P.2d at 1310; *Anthoine*, 605 F.3d at 752 (reiterating that employers are "entitled to summary judgment if they can demonstrate that they would have reached the same adverse employment decision even in the absence of the employee's protected conduct.") (citation omitted).

## C.       Fair Labor Standards Act Claim -- Standards

"It is axiomatic, under the FLSA, that employers must pay employees for all hours worked." *Alvarez v. IBP, Inc.*, 339 F.3d 894, 902 (9th Cir. 2003) (citations and internal quotation marks omitted).  And, subject to certain exemptions not relevant here, "29 U.S.C. § 207(a)(1) requires that employers pay time-and-a-half for hours worked in excess of 40 per workweek." *Navarro v. Encino Motorcars, LLC*, 780 F.3d 1267, 1270 (9th Cir. 2015).  "But the FLSA did not define 'work' or 'workweek,' and [the Supreme] Court interpret[s] those terms broadly." *Integrity Staffing Sols., Inc. v. Busk*, 135 S. Ct. 513, 516 (2014). "'Work,' the Supreme Court has long noted, is 'physical or mental exertion

(whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer.'" *Alvarez*, 339 F.3d at 902 (quoting *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944)).[9] "Work not requested but suffered or permitted is work time." 29 C.F.R. § 785.11.[10]

"An employee seeking to recover . . . overtime under the FLSA 'has the burden of proving that [she] performed work for which [she] was not properly compensated.'" *Brock v. Seto*, 790 F.2d 1446, 1447-48 (9th Cir. 1986) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). But "[e]mployees seldom keep such records themselves; even if they do, the records may be and frequently are untrustworthy." *Anderson*, 328 U.S. at 687. "In view

[9] In the Portal-to-Portal Act, Congress subsequently overruled aspects of *Tennessee Coal* and a subsequent case, *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), by exempting two categories of work-related activities that "occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases . . . principal activity[.]" *Integrity Staffing Sols., Inc.*, 135 S. Ct. at 517 (quoting 29 U.S.C. § 254(a)).

[10] 29 C.F.R. § 785.11 provides:

Work not requested but suffered or permitted is work time. For example, an employee may voluntarily continue to work at the end of the shift. He may be a pieceworker, he may desire to finish an assigned task or he may wish to correct errors, paste work tickets, prepare time reports or other records. The reason is immaterial. The employer knows or has reason to believe that he is continuing to work and the time is working time.

of the remedial purpose of the FLSA and the employer's statutory obligation 'to keep proper records of wages, hours and other conditions and practices of employment,' this burden is not to be 'an impossible hurdle for the employee.'" *Brock*, 790 F.2d at 1448 (quoting *Anderson*, 328 U.S. at 687). Where an employer has failed to keep records, "the solution . . . is not to penalize the employee by denying [her] any recovery on the ground that [she] is unable to prove the precise extent of uncompensated work." *Anderson*, 328 U.S. at 687.

Rather, *Anderson* enunciated a burden-shifting standard that applies "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes." *Id.* "[A]n employee has carried out [her] burden if [she] proves that [she] has in fact performed work for which [she] was improperly compensated and if [she] produces sufficient evidence to show the amount and extent of that work *as a matter of just and reasonable inference*." *Id.* (emphasis added). "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687-88. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688. *See also, e.g.*, *Brock*, 790 F.2d at 1448 (applying *Anderson* where "the *fact*

34

of damage is certain," and the "only uncertainty is the *amount* of damage").

Additionally, if an "employer knows or has reason to believe that [an employee] is continuing to work [then] the time is working time." 29 C.F.R. § 785.11. That is, "an employer must have actual or constructive knowledge that its employees performed work without being compensated." *Lillehagen v. Alorica, Inc.*, 2014 WL 6989230, at *17 (C.D. Cal. Dec. 10, 2014) (citation omitted). This is because "an employer who knows or should have known that an employee is or was working overtime must comply with [the FLSA]." *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981). "An employer who is armed with this knowledge cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation." *Id.*

On the other hand,

> where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of [the FLSA].

*Id.*

**D.      Fair Labor Standards Act Claim -- Application of Standards**

VIPdesk argues that Tagupa's FLSA claim fails as a matter of law for

three reasons.  First, Tagupa has admitted that the fourteen or fifteen blog entries

that she submitted to VIPdesk were prepared *before* VIPdesk asked employees to

prepare or submit blog entries.  *See* Doc. No. 64, Def.'s CSF ¶ 12; Doc. No. 71,

Pl.'s CSF at 3 (admitting Def.'s CSF ¶ 12); Doc. No. 64-3, Def.'s Ex. 3 at 19

(Tagupa Dep. at 188).  That is, she had previously prepared the blogs, presumably

for other purposes.  VIPdesk thus contends that hours associated with those entries

could not have been incurred "'necessarily and primarily for" VIPdesk's benefit.

*Alvarez*, 339 F.3d at 902.  Essentially, it argues that any such work was not

"suffered or permitted."  29 C.F.R. § 785.11.

Second, VIPdesk contends that it could not have known about any

overtime because Tagupa, who worked remotely, (1) "did not obtain permission

from her supervisor to work overtime hours preparing blog entries, performing

work-related mailings, performing pre-shift work, or addressing technical issues,"

and (2) "did not inform VIPdesk that she was performing overtime pre-shift work,

work-related mailings, or work on technical issues until well after the fact."  Doc.

No. 64-1, Ornellas Decl. ¶¶ 3, 4.

Third, VIPdesk argues that Tagupa has fabricated or falsified her time

36

sheets in an attempt to satisfy her burden to provide evidence of overtime hours

worked.  During discovery, Tagupa responded to an interrogatory that asked how

she "tracked the time [she] spent preparing each blog entry" by answering "I

logged hours daily."  Doc. No. 64-6, Def.'s Ex. D.  The record contains three

different sets or compilations of time records (one submitted to the Hawaii

Department of Labor, and two to Defendants in response to discovery requests in

this case), *see* Doc. Nos. 64-7, 64-8, 64-9 to 11, Def.'s Exs. E, F, and G, which

each reflect different numbers of hours.  Tagupa admitted in her deposition that

she "didn't create [her] log until [she] submitted something the first time to the

Hawaii Department of Labor," explaining her interrogatory response to mean she

"logged them in my head."  Doc. No. 64-3, Def.'s Ex. A at 21, Tagupa Dep. at

196.  VIPdesk characterizes Tagupa's responses as "perjury," arguing that such

fabricated evidence by itself justifies dismissing the action.[11]  In any event,

---

[11]  It is not appropriate to address VIPdesk's accusation of "perjury" in this summary judgment proceeding.  In any event, a factfinder might well disbelieve Tagupa's answer that she logged hours "in her head," without determining that she committed perjury -- generally defined as giving "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).  After all, "a literally true answer, even though unresponsive or 'shrewdly calculated to evade,' cannot form the predicate for [] perjury[.]"  *United States v. Sainz*, 772 F.2d 559, 563 (9th Cir. 1985) (quoting *Bronston v. United States*, 409 U.S. 352, 362 (1973)).  To be clear, the court does not condone false testimony, but in this instance, the question whether Tagupa committed perjury during discovery involves a factual interpretation that is inappropriate at summary judgment.

VIPdesk contends that Tagupa's evidence of her overtime is insufficient "to show the amount and extent of that work as a matter of just and reasonable inference." Doc. No. 73, Def.'s Reply at 12 (quoting *Anderson*, 328 U.S. at 687).

Tagupa admits that the records are inconsistent. *See* Doc. No. 71, Pl.'s CSF at 3 (admitting Defendant's CSF ¶ 21, Doc. No. 64, that Tagupa "claimed to have worked 102 hours more in overtime to Defendants in this litigation than she claimed to the Department of Labor"). She contends, however, that she "estimated the time she spent working on blogs as best she could after the fact[.]" *Id.* ¶ 20. Estimating time is allowable, depending on the circumstances. *See Anderson*, 328 U.S. at 687 ("Employees seldom keep such records themselves; even if they do, the records may be and frequently are untrustworthy.").

Given the evidence in the record -- which the court is obligated to construe in Tagupa's favor -- the court is unable to grant VIPDesk's Motion as to all of her FLSA claim. Even if some of Tagupa's time records seek overtime for the fifteen blogs that she prepared before VIPdesk asked for "volunteers," she also declares that she spent overtime hours working "another fifty-two (52) blogs for Defendant's for-profit purposes in order to be considered a team player." Doc. No. 71-22, Tagupa Decl. ¶ 10. She also declares that she "was in the process of creating additional blogs but was fired on 9/8/2011, and . . . was unable to submit

those blogs." *Id.* ¶ 32.

Moreover, Tagupa's FLSA claim is based on more than just overtime for blog work. Even VIPdesk's Motion characterizes Tagupa's claims as "based on her allegation that she is owed overtime compensation for . . . drafting blog entries for Defendant *and* for time and money she allegedly spent on work-related mailings." Doc. No. 63-1, Def.'s Mot. at 6 (emphasis added). Many of the timesheets in the record indicate Tagupa is seeking overtime for matters such as "dri[ving] 4 miles to and from Ewa Beach Post Office, [and] wait[ing] in line to mail travel documents to VIPdesk customer." Doc. No. 64-9, Def.'s Ex. G-1 at 2 to 79 (multiple requests for that task); *see also id*. at 80 to 98 (similar task to and from Kamuela Post Office). Tagupa is also claiming overtime for other work such as "'pre shift' time that she spent working for VIPdesk, post-shift time spent on work-related mailings, and time spent addressing technical issues." Doc. No. 64, Def.'s CSF ¶ 22; Doc. Nos. 64-12 to 64-14, Def.'s Exs. H-1 to H-3. Such a claim is apparently similar to Tagupa's claim made to the Hawaii DLIR that she worked at least eight hours a day from September 1, 2010 to September 8, 2011, but was only paid for 7.5 hours per week. *See* Doc. No. 71-20, Pl.'s Ex. T.

In other words, the record contains prima facie evidence (if believed) "of just and reasonable inference" of at least some overtime work performed on

VIPdesk's behalf, and VIPdesk has not -- at least at this stage -- "negat[ed] the reasonableness" of all of such evidence.  *Anderson*, 328 U.S. at 688.  It may be that many of the hours that Tagupa claims as overtime were not, in reality, performed for VIPdesk's benefit (if they were performed at all).  But VIPdesk seeks summary judgment on the FLSA claim as a whole, and the record is disputed as to some of Tagupa's claim.

At oral argument, Tagupa's counsel clarified that she does not seek overtime for work done on the fourteen or fifteen blogs that were actually submitted to, and published by, VIPdesk.  Tagupa admits that she already prepared these blogs for other purposes, before VIPdesk announced its "Concierge Blog." That is, she only seeks overtime for work done on other blogs -- some fifty two blogs that were apparently never actually submitted to VIPdesk, and for other blogs that she claims to have been preparing.  And indeed, the blogging-related timesheets that she provided to VIPdesk during discovery appear to be dated on or after June 14, 2010 (when VIPdesk first announced it was seeking blogs from its employees).[12]  *See, e.g.*, Doc. No. 64-9, Def.'s Ex. G-1 at 99.

---

[12]  The record contains over 750 pages of unclassified timesheets or compilations of hours submitted by Tagupa.  *See* Doc. No. 64-9, Def.'s Ex. G-1 (284 pages); Doc. No. 64-10, Def.'s Ex. G-2 (286 pages); and Doc. No. 64-11, Def.'s Ex. G-3 (148 pages).  The parties have not categorized them by task, and did not attempt to excise and compile hours that represent

(continued...)

Similarly, VIPdesk might well be able to prove that it had no notice of (and no reason to know of) some or all of these claimed overtime hours. But the record in this regard is unclear -- although Ornellas indicates that VIPdesk was not informed until "well after the fact," it is unclear what that means. There is evidence that Tagupa complained to the U.S. Department of Labor in March 2011 that VIPdesk "failed to pay for hours worked," Doc. No. 71-13, Pl.'s Ex. M at 3, including a complaint that it "was not compensating Plaintiff for travel to and from the U.S. Post Office for mailing documents." Doc. No. 71-22, Tagupa Decl. ¶ 18. There is also evidence from which it can reasonably be inferred that VIPdesk knew (or should have known) that she was working on blogs, and wanted to be paid for such work. *See, e.g.*, *id.* ¶ 22; Doc. No. 71-14, Pl.'s Ex. N (email stating, in part, "the issue stems from not paying non-exepmt [sic] hourly employees for work done to benefit the company finalncially [sic]. As I understand it, this is illegal on the Fed and State level and I want to be compensated for the work I have done . . ."); Doc. No. 71-22, Tagupa Decl. ¶ 21 (August 5, 2011 communication from Tagupa to VIPdesk, allegedly stating in part "I want to have addressed the issue of not paying me for my blog submissions.").

_____

[12](...continued)
recoverable and unrecoverable hours.

In short, summary judgment is inappropriate to the extent VIPdesk contends it had no notice of Tagupa's overtime claims.  *See Forrester*, 646 F.2d at 414.

Accordingly, VIPdesk's Motion is GRANTED, but only to the extent that Tagupa's Complaint in this action could be construed as seeking overtime under the FLSA for any work performed on blogs before June 14, 2010 (that is, the fourteen or fifteen blogs submitted to VIPdesk that she had already prepared). In all other respects, VIPdesk's Motion as to the FLSA claim is DENIED.  The record contains sufficient evidence, construed in Tagupa's favor, to create a genuine issue of material fact as to whether Tagupa is entitled to at least some amount of recovery under the FLSA.  *See Brock*, 790 F.2d at 1448 (applying *Anderson* where the "only uncertainty is the *amount* of damage").

///

///

///

///

///

///

///

///

42

## V. **CONCLUSION**

Defendant VIPdesk, Inc.'s Motion for Summary Judgment, Doc. No. 63, is GRANTED in part and DENIED in part. Summary judgment is (1) GRANTED in favor of VIPdesk as to Count Two (HWPA), but (2) GRANTED in part and DENIED in part as to Count One (FLSA).

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 28, 2015.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Tagupa v. VIPdesk, Inc.*, Civ. No. 13-00428 JMS KSC, Order Granting in Part and Denying in Part Defendant VIPdesk, Inc.'s Motion for Summary Judgment